UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
NORTHERN DIVISION
ASHLAND

| | | |
|---|---|---|
| LARRY MCLAUGHLIN, | ) | |
| | ) | |
| Plaintiff, | ) | Civil No. 13-54-GFVT |
| | ) | |
| V. | ) | |
| | ) | |
| CAROLYN COLVIN, | ) | **MEMORANDUM OPINION** |
| Commissioner of Social Security, | ) | **&** |
| | ) | **ORDER** |
| Defendant. | ) | |

\*\*\* \*\*\* \*\*\* \*\*\*

The Plaintiff, Larry McLaughlin, brought this action pursuant to 42 U.S.C. § 405(g) to obtain judicial review of an administrative decision of the Commissioner of Social Security (Commissioner) denying McLaughlin's application for Supplemental Security Income. The Court, having reviewed the record and for the reasons set forth herein, will deny McLaughlin's Motion for Summary Judgment [R. 12] and grant the Commissioner's [R. 14].

I

McLaughlin filed his application for SSI on October 15, 2010. [Transcript (Tr.) 26-27]. He alleges a disability beginning on July 20, 2005, due to problems anxiety, depression, and agoraphobia. [Tr. 26-17, 141-146, 161]. McLaughlin's application was denied initially and upon reconsideration [Tr. 26, 36]. Subsequently, at McLaughlin's request, an administrative hearing was conducted before Administrative Law Judge Maria Hodges (ALJ) on August 9, 2012. [Tr. 335-363]. During the hearing, the ALJ heard testimony from McLaughlin and vocational expert (VE) Leah Salyers. [*Id*.] McLaughlin, who was thirty-two years old as of the date of the ALJ's decision, has a tenth grade education. [Tr. 13, 131, 162]. McLaughlin has past relevant work as

a night watchmen, production assembler, and kitchen helper, and though the VE testified that he could no longer perform that work, she found that there are jobs that exist in significant numbers in the national economy that McLaughlin could perform, and the ALJ accepted that testimony. [Tr. 162, 357-60].

In evaluating a claim of disability, an ALJ conducts a five-step analysis. *See* 20 C.F.R. §§ 404.1520, 416.920.[1] First, if a claimant is working at a substantial gainful activity, he is not disabled. 20 C.F.R. § 404.1520(b). Second, if a claimant does not have any impairment or combination of impairments which significantly limit his physical or mental ability to do basic work activities, then he does not have a severe impairment and is not disabled. 20 C.F.R. § 404.1520(c). Third, if a claimant's impairments meet or equal an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1, he is disabled. 20 C.F.R. § 404.1520(d). Fourth, if a claimant's impairments do not prevent him from doing past relevant work, he is not disabled. 20 C.F.R. § 404.1520(e). Fifth, if a claimant's impairments (considering her residual functional capacity, age, education, and past work) prevent him from doing other work that exists in the national economy, then she is disabled. 20 C.F.R. § 404.1520(f).

In this case, at Step 1, the ALJ found that McLaughlin has not engaged in substantial gainful activity since October 15, 2010, the application date. [Tr. 18.] At Step 2, the ALJ found

---

[1] The Sixth Circuit summarized this process in *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469 (6th Cir. 2003):

> To determine if a claimant is disabled within the meaning of the Act, the ALJ employs a five-step inquiry defined in 20 C.F.R. § 404.1520. Through step four, the claimant bears the burden of proving the existence and severity of limitations caused by her impairments and the fact that she is precluded from performing her past relevant work, but at step five of the inquiry, which is the focus of this case, the burden shifts to the Commissioner to identify a significant number of jobs in the economy that accommodate the claimant's residual functional capacity (determined at step four) and vocational profile.

*Id.* at 474 (internal citations omitted).

that McLaughlin has the following severe impairments: "anxiety, depression, and borderline intellectual functioning." [*Id*.] At Step 3, the ALJ found that McLaughlin's impairments did not meet or medically equal one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix I. [Tr. 19]. At Step 4, the ALJ determined that McLaughlin is unable to perform any past relevant work. [Tr. 24]. However, at Step 5 the ALJ relied on the testimony of the VE to find that, based on McLaughlin's residual functional capacity, there are jobs that exist in significant numbers in the national economy that McLaughlin could perform. [Tr. 24-25]. Accordingly, on August 15, 2012, the ALJ issued an unfavorable decision, finding that McLaughlin was not disabled, and therefore, ineligible for SSI. [Tr. 25]. The Appeals Council declined to review the ALJ's decision on August 14, 2012 [Tr. 7-9] and McLaughlin now seeks judicial review in this Court.

II

This Court's review is limited to whether there is substantial evidence in the record to support the ALJ's decision. 42 U.S.C. § 405(g); *Wright v. Massanari*, 321 F.3d 611, 614 (6th Cir. 2003); *Shelman v. Heckler*, 821 F.2d 316, 319-20 (6th Cir. 1987). "Substantial evidence" is "more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Cutlip v. Sec'y of Health & Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994). The substantial evidence standard "presupposes that there is a zone of choice within which decision makers can go either way, without interference from the court." *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986) (*en banc*) (quotes and citations omitted).

In determining the existence of substantial evidence, courts must examine the record as a whole. *Id.* (citing *Kirk v. Sec'y of Health & Human Servs.*, 667 F.2d 524, 535 (6th Cir. 1981),

3

*cert. denied*, 461 U.S. 957 (1983)). However, courts are not to conduct a *de novo* review, resolve conflicts in evidence, or make credibility determinations. *Id.* (citations omitted); *see also Bradley v. Sec'y of Health & Human Servs.*, 862 F.2d 1224, 1228 (6th Cir. 1988). Rather, if the Commissioner's decision is supported by substantial evidence, it must be affirmed even if the reviewing court would decide the matter differently, and even if substantial evidence also supports the opposite conclusion. *See Her v. Comm'r of Soc. Sec.*, 203 F.3d 388, 389-90 (6th Cir. 1999); *see also Casey v. Sec'y of Health & Human Servs.*, 987 F.2d 1230, 1233 (6th Cir. 1993); *Kinsella v. Schweiker*, 708 F.2d 1058, 1059 (6th Cir. 1983); *Mullen*, 800 F.2d at 545.

McLaughlin's argues on appeal that the ALJ erred in rejecting two examining opinions and relying on a non-examining source who did not have the opportunity to review the entire file. [R. 12-1 at 1]. According to 20 C.F.R. §§ 404.1527(d) and 416.927, ALJs are required to evaluate all submitted medical opinions. In performing this evaluation, the ALJ considers the following factors: the examining relationship, the treatment relationship, the length of the treatment relationship, the frequency of examination, the nature and extent of the treatment relationship, the supporting medical basis of the opinion, the consistency with the larger record, the specialization of the source, the source's understanding of the Commissioner's disability programs and their evidentiary requirements, and the medical source's familiarity with the other information in the case record. 20 C.F.R. §§ 404.1527(d) and 416.927; *see also Norris v. Comm'r of Soc. Sec.*, 461 F. App'x 433, 438-39 (6th Cir. 2012).

The regulations also provide "a presumptive sliding scale of deference," which operates as follows:

> An opinion from a treating physician is accorded the most deference by the SSA because of the ongoing treatment relationship between the patient and the opining physician. A nontreating source, who physically examines the patient but does not

4

> have, or did not have an ongoing treatment relationship with the patient, falls next along the continuum. A nonexamining source, who provides an opinion based solely on review of the patient's existing medical records, is afforded the least deference.

*Norris*, 461 F. App'x at 438-39 (citing *Smith v. Comm'r of Soc. Sec.,* 482 F.3d 873, 875 (6th Cir.2007)) (internal quotation marks and citations omitted). Importantly, however, "it is not a *per se* error of law….for the ALJ to credit a nonexamining source over a nontreating source." *Id*. at 439. In some circumstances, an ALJ is justified in relying on a nonexamining source over an examining source. *See Ealy v. Comm'r of Soc. Sec.*, 594 F.3d 504, 514 (6th Cir. 2010); *Barker v Shalala*, 40 F.3d 789, 794 (6th Cir. 1994). Further, "[i]n appropriate circumstances, opinions from State agency medical and psychological consultants and other program physicians and psychologists may be entitled to greater weight than the opinions of treating or examining sources." SSR 96-6P. After all,"[a]ny record opinion, even that of a treating source, may be rejected by the ALJ when the source's opinion is not well supported by medical diagnostics or if it is inconsistent with the record." *Norris*, 461 F. App'x at 439 (citing 20 C.F.R. §§ 404.1527, 416.927; *Ealy,* 594 F.3d at 514).

Therefore, it is not inherently improper under the aforementioned regulations and legal standards for the ALJ to give greater weight to the state agency physician who did not examine McLaughlin than the other medical sources who did. The important inquiry is whether, in light of these regulations and standards, substantial evidence from the record supports the weight that the ALJ afforded each of the identified medical sources in making this disability determination.

Dr. Emily Skaggs, the first of the two examining medical sources, examined McLaughlin for what appears to be the only time on February 11, 2011. [Tr. 230]. Without testing, Dr. Skaggs noted that McLaughlin demonstrated anxiety, which she rated as a five on a scale of one

to ten. [Tr. 232]. She found that McLaughlin demonstrated a Global Assessment Functioning (GAF) score of 57. [Tr. 233]. Dr. Skaggs opined that McLaughlin experienced moderate limitations in his capacity to understand, remember, and carry out instructions toward performance of simple repetitive tasks; to sustain attention and concentration; and to respond appropriately to supervisors and coworkers in a work setting. [Tr. 233-34]. Additionally, Dr. Skaggs found that McLaughlin had marked limitations in his ability to tolerate stress and pressure of day-to-day employment. [Tr. 234].

On April 17, 2012, Dr. Leigh Ann Ford examined McLaughlin. [Tr. 287]. Dr. Ford noted that McLaughlin's mood was pessimistic and his affect appeared variable. [Tr. 288]. According to Dr. Ford, McLaughlin scored below average on every subtest of the WASI, and his Full Scale IQ score was 67. [Tr. 289]. Based on the BDI-11 and the BAI, Dr. Ford classified McLaughlin's anxiety as severe. [Tr. 290]. Dr. Ford assessed McLaughlin's GAF at 55. [291]. In the section of her opinion entitled "prognosis and recommendation," she stated as follows: "[t]he prognosis for the claimant depends largely on his willingness to continue treatment (medication and/or counseling). It is the opinion of the examiner that while the claimant could possibly attain employment, it would be unlikely he could sustain full time employment due to current (emotional, intellectual, and academic) impairments." [Tr. 291]. In developing that determination more fully, Dr. Ford noted that McLaughlin rated as "poor" (meaning seriously limited but not precluded) in his ability to deal with the public, use judgment, deal with work stress, and function independently. [Tr. 293].

As an initial matter, it should be noted that there is no real argument that Dr. Skaggs or Dr. Ford are treating physicians. Further, it appears from that record that they merely examined McLaughlin on one occasion and did not maintain a long-term treating relationship with him.

6

These factors generally reduce the deference that the ALJ needed to afford these sources on the scale of authority. It is also important to note that, though the ALJ gave little weight to Dr. Ford's opinions in general, she accepted the majority of Dr. Skaggs's opinions to be credible and consistent with the record. [Tr. 23-24]. The ALJ only took issue with Dr. Skaggs's conclusions that McLaughlin had marked limitations in in tolerating stress and pressure of day-to-day employment. [Tr. 23]. The reasons given by the ALJ for rejecting these opinions are that they are generally inconsistent with the record as a whole, including McLaughlin's response to treatment, the activities of his daily life, and the longitudinal mental health records from Pathways. [Tr. 23-24]. As detailed below, the Court finds that this conclusion and its rationale are supported by substantial evidence of the record.

    First, the record reveals that McLaughlin experienced positive results from his treatment and medication. In October 2010, the Pathways medical provider prescribed Zoloft to McLaughlin to address his anxiety and depression. [Tr. 244]. About three months later, and one month after being examined by Dr. Skaggs, McLaughlin reported that he was "doing well" and "rarely feels nervous or anxious." [Tr. 241]. When he reported the loss of some benefit from the medication and an increase in anxiety in April and August of 2011, Pathways increased the prescribed dosage of Zoloft. [Tr. 240]. Despite occasionally missing his medication, McLaughlin demonstrated a pleasant mood and affect in January 2012, rating his anxiety at a six and his depression as a four out of ten. [Tr. 260]. Between January and May 2012, McLaughlin had apparently felt so much better that he stopped taking his medications for two months. [Tr. 296]. As a result, he reports a return of paranoia, depression, and anxiety. [Tr. 296]. To put this into context, this means that nearly a month before being examined by Dr. Ford, McLaughlin had felt well enough that he stopped taking Zoloft. By the time he was examined by Dr. Ford, he had

been off his medication for nearly a month.² This perhaps explains Dr. Ford's comment that "[t]he prognosis for the claimant depends largely on his willingness to continue treatment (medication and/or counseling)." [Tr. 291]. However, the extent to which the medication, when he took it, treated McLaughlin's anxiety is inconsistent with the conclusion of Dr. Ford that "it would be unlikely [McLaughlin] could sustain full time employment due to current (emotional, intellectual, and academic) impairments." [Tr. 291]. That record fact is also inconsistent with the marked limitation assessed by Dr. Skaggs one month before the records indicate that the medication was helping McLaughlin such that he rarely felt anxious or nervous.

Other facets of their own assessments are also inconsistent with the severe limitations that the examining sources reported. Dr. Skaggs and Dr. Ford evaluated McLaughlin to have a GAF score of 57 and 55 respectively. The GAF scale, which ranges for 0-100, is "a method of considering psychological, social, and occupational function on a hypothetical continuum of mental health." *Norris,* 461 F. App'x at 436. "Scores between 51 and 60 represent moderate symptoms or a moderate difficulty in social, occupational, or school functioning, whereas scores between 41 and 50 represent serious symptoms or serious impairment in these areas." *Id.* (citing Am. Psychiatric Ass'n, *Diagnostic and Statistical Manual of Mental Disorders* 32 (4th ed.1994)). It is difficult to reconcile the facts that both medical sources assessed McLaughlin as being solidly in the middle of the GAF scale – revealing moderate impairment of occupational functioning – with Dr. Skaggs's assessment of marked limitations in the ability to tolerate stress and pressure of day-to-day employment, or Dr. Ford's opinion that that McLaughlin essentially could not sustain employment at all. This is especially notable considering the record shows the

---

² When he was examined at Pathways on May 23, 2012, he reported that he had been off his medication for two months. [Tr. 296]. He was examined by Dr. Ford on April 17, 2012. [Tr. 287].

McLaughlin's medication generally improved his symptoms and he had been off that medication for nearly a month when he was examined by Dr. Ford. Further, during their examinations, either Dr. Skaggs, Dr. Ford, or both recognized that McLaughlin was cooperative, normal in speech and eye contact, could spell words backwards or count in reverse, and had appropriate thought content. These assessments and observations are not consistent with the severity of some of the limitations discussed by Dr. Skaggs and Dr. Ford.

Finally, the activities of McLaughlin's daily life, as set forth in the record, are not consistent with the conclusions of Dr. Skaggs and Dr. Ford. It is true that McLaughlin consistently maintains that he does not often go into public because he does not like to be around a lot of people. However, at various places in the record, McLaughlin reports to being able to maintain his personal hygiene, help with housework, engage in yard work every couple weeks, prepare food, manage bills, and count change. [Tr. 166-173, 231-32]. Throughout the record McLaughlin indicates that he is able to watch television and play video games, and in one assessment he elaborates that he does those activities a lot. [Tr. 171]. He also seems to maintain interaction with others in that he checks his email, sees his family weekly, and reports to getting along with friends, family, and authority figures. [Tr. 170-73, 207-08, 231-32]. Again, when considered in the context of the record, these are not the daily life activities of someone as limited as Dr. Skaggs and Dr. Ford represent McLaughlin to be.

Dr. Skaggs and Dr. Ford may have had the opportunity to examine McLaughlin, but they were not his treating physician, examined him only one time, and produced opinions that are internally inconsistent and not supported by the evidence as a whole. As a result, substantial evidence supports the ALJ's decision to give little weight to the marked limitation assessment of Dr. Skaggs and the opinion of Dr. Ford.

On the other hand, the previously discussed record facts do provide substantial evidence for giving weight to the opinion to the consultative examination of Dr. Alex Guerrero. Dr. Guerrero reviewed McLaughlin's record on June 3, 2011. [Tr. 45]. He found that McLaughlin had depression and anxiety, resulting in mild restrictions in activities of daily living and moderate difficulties in social functioning and concentration, persistence, and pace. [Tr. 41]. Dr. Guerrero opined that McLaughlin was moderately limited in his ability to maintain concentration and attention for extended periods of time, to complete a normal workday and work week without interruptions from psychologically based symptoms, to perform at a consistent pace without an unreasonable number and length of rest, interact appropriately with the general public, accept instructions and respond appropriately to criticism from supervisors, to get along with coworkers or peers without distracting them or exhibiting behavioral extremes, and to respond appropriately to workplace changes. [Tr. 43-44]. As a result, Dr. Guerrero did not think McLaughlin should work with the public, but did conclude that he has the ability to understand simple instructions, attend and concentrate for two hours, interact appropriately with peers and supervisors, and adapt to routine workplace changes. [Tr. 44-45].

Dr. Guerrero did not treat or examine McLaughlin, but in conducting his consultative review, his conclusions are consistent with and supported by record as it has been previously described. It is notable that Dr. Guerrero's opinion is consistent of the vast majority of Dr. Skaggs's opinion as well. And while Dr. Guerrero did not have the opportunity to review a portion of the record including the findings of Dr. Ford, the Court has already found that substantial evidence supports a conclusion that Dr. Ford's opinions are inconsistent with the record as a whole. Further, he was able to consider more of the record than Dr. Skaggs, who McLaughlin seeks to have credited in part. Finally, as a state agency medical consultant, Dr.

Guerrero had a great amount of understanding of disability programs and evidentiary requirements. For these reasons, the ALJ did not err in giving more weight to Dr. Guerrero, who did not examine McLaughlin, than Dr. Skaggs and Dr. Ford, who did.

This is not a "preposterous" result as McLaughlin claims. It is not as though the record is nothing but the opinions of three doctors among which the ALJ has to choose. This record contains objective medical records, statements from the claimant about his activities of daily living, as well as the evaluations of three medical sources. The ALJ considered all of these things in making her determination, not just the opinion of Dr. Guerrero. Due to the nature of the relationship and lack of supportability and consistency with the record, the ALJ did not place great weight the opinion of Dr. Ford and one of the limitations of Dr. Skaggs. As previously discussed,"[a]ny record opinion, even that of a treating source, may be rejected by the ALJ when the source's opinion is not well supported by medical diagnostics or if it is inconsistent with the record." *Norris*, 461 F. App'x at 439 (citing 20 C.F.R. §§ 404.1527, 416.927; *Ealy,* 594 F.3d at 514). In an independent decision, the ALJ found that Dr. Guerrero's opinion was consistent with the record and should be afforded great weight. Since the ALJ's decision about the appropriate weight to afford each of these medical sources is supported by substantial evidence, McLaughlin's motion for summary judgment arguing to the contrary shall be denied.

III

Accordingly, for the aforementioned reasons, it is hereby **ORDERED** as follows:

(1) Plaintiff's Motion for Summary Judgment [R. 12] is **DENIED**;

(2) Defendant's Motion for Summary Judgment [R. 13] is **GRANTED**

(3) **JUDGMENT** in favor of the Defendant will be entered contemporaneously herewith.

This the 30th day of September, 2014.



Signed By:
*Gregory F. Van Tatenhove*
United States District Judge